IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D
FEB 19 2016
ARTHUR JOHNSTON
BY _____ DEPUTY

| | |
|---|---|
| TESCO HOLDINGS, LLC, f/k/a TRINROCK ENERGY SERVICES, LLC, § § § | |
| Plaintiff, § | |
| vs. § | CIVIL ACTION NO. 3:16cv125HTW-LRA |
| § § | |
| DANNY M. BYRD and DBI HOLDINGS, INC., § § | |
| Defendants. § | |

**COMPLAINT UNDER THE SECURITIES
EXCHANGE ACT AND PENDENT STATE LAW CLAIMS**

Plaintiff Tesco Holdings, LLC, f/k/a TrinRock Energy Services, LLC ("Plaintiff"), files this *Complaint Under the Securities Exchange Act and Pendent State Law Claims* against Defendants Danny M. Byrd ("Byrd") and DBI Holdings, Inc. ("Holdings" and together with Byrd, "Defendants"), and in support thereof would show the Court as follows:

**I. INTRODUCTION**

1.     This is an action under Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C.A. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10B-5, as well as the Mississippi Securities Act of 2010 and common law, for injury arising out of Plaintiff's purchase of 75% of the membership interests in Danny Byrd, LLC, a Mississippi limited liability company f/k/a Danny Byrd, Inc. (the "Company"). Defendants intentionally, falsely represented the Company to be a diverse, multifaceted business enterprise with the capability to pursue immediate prospects in the midstream fabrication and repair market and as having a valve distributorship, in addition to the Company's traditional upstream rig manufacture and repair business. In fact, the Company was only a one-trick pony in rig manufacture alone that (i) lacked the capability to simultaneously perform a significant amount of rig repair and maintenance work, (ii) lacked a customer base and the expertise to estimate costs or to perform midstream work, and (iii) was not a distributor. The midstream line of business, which was

critical to Plaintiff's decision to purchase the membership interests, was so unprofitable that Plaintiff had to close most of it down to stem the losses. Well aware that the Company's lack of diversification made Company vulnerable to adverse market conditions, Defendants decided to unload most of the Company's equity on an unsuspecting purchaser, Plaintiff. To its injury, Plaintiff relied on Defendants' intentional multiple untrue statements of material fact and without knowledge of material omissions of material fact by Defendants all pertaining to the operations and prospects of the Company at the time of purchase complained of herein.

## II. PARTIES

2. Tesco is a Texas limited liability company with its principal place of business in Houston, Texas.

3. Byrd is an individual residing in this District. At all material times Byrd was the President and controlling person of Holdings.

4. Holdings is a Mississippi corporation with its principal place of business in this District Prior to April 15, 2014, Holdings owned all the membership interests in the Company and all the equity in the Company's predecessor, Danny Byrd, Inc.

## III. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C.A § 78aa, as well as under the Court's general federal question jurisdiction under 28 U.S.C. § 1331 as this action presents a federal question and claim under the Exchange Act, seeking relief for material misrepresentations and omissions proscribed by Section 10(b) of the Exchange Act, 15 U.S.C.A. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b5.

6. This Court has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C.A. § 1367 as these claims are related to the federal claim such that they form the same case and controversy.

7. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

**COMPLAINT UNDER THE SECURITIES EXCHANGE ACT ETC.-PAGE 2**

197561.2

## IV. FACTUAL ALLEGATIONS

8. At all relevant times Plaintiff has been a holding company for private investments.

9. The Company was founded in 1983 by Defendant Byrd and operated under the name Danny Byrd, Inc. until in or about April 2014 when it was converted into Danny Byrd, LLC, a Mississippi limited liability company. At all relevant times the Company, under the trade name DBI Welding and Fabrication, has been engaged in the business of fabricating, welding, machining, repairing, and transporting equipment used principally in the oil and gas industry.

10. Prior to April 15, 2014, Defendant Holdings owned 100% of the membership interests in the Company.

11. At all relevant times Defendant Byrd has been the President and, within the meaning of 15 U.S.C.A. §77o, a controlling person of Defendant Holdings and, prior to April 15, 2014, of the Company.

12. In or about the fall of 2013, Defendants put the Company up for sale and retained a business broker to aid them in selling the Company. The broker sent out a Confidential *Descriptive Report* describing the Company's business and ownership containing information supplied by Defendants.

13. On or about April 15, 2014, Plaintiff and Defendants entered into a *Membership Interest Purchase Agreement* (the "Purchase Agreement"), pursuant to which Defendants sold and Plaintiff purchased 75% of the membership interests in the Company (the "Securities").

14. The purchase price for the Securities was $5,590,000 in cash paid by Plaintiff at closing and a 7% subordinated note of the Company payable to Holdings in the principal amount of $5,500,000. In connection with the purchase and the ongoing operation of the business, Plaintiff was required to guaranty to a commercial bank a term loan to the Company, a revolving credit facility, a capital expenditure or equipment facility, and an additional real estate term loan (collectively, the "Bank Loans"). The total amount of the Bank Loans currently outstanding is approximately $3.3 million.

15. Defendants induced Plaintiff to enter into the Purchase Agreement, to purchase the Securities, and to guarantee the Bank Loans by making multiple untrue statements of material fact and omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, as set forth below. Plaintiff did not discover the misrepresentations and omissions until after it had purchased the Securities.

16. In the year prior to the Plaintiff's purchase of the Securities, Defendants decided to sell the Company due to concerns about the future prospects of new rig fabrication orders from its principal customer, Helmerich & Payne, Inc. ("H&P"). In order to create the illusion of a diversified business enterprise that would attract buyers, Defendants represented that the Company had three viable lines of business: (i) the upstream rig fabrication, maintenance, and repair business, (ii) the midstream fabrication and repair business, and (iii) the valve distributorship business. The midstream line of business was of particular interest to Plaintiff because it represented a hedge against a downturn in upstream business. However, after purchasing the Securities, Plaintiff discovered that Defendants had misrepresented critical facts about all three lines of business and concealed other material facts.

17. At all relevant times, the Company's largest customer in the upstream business line and the Company as a whole—comprising about 90% of the Company's revenue—has been H&P. Prior to Plaintiff's purchase of the Securities, Defendants made representations to Plaintiff that the Company had a sizeable and ongoing business relationship with H&P for rig repair and maintenance services. They represented that several divisions of H&P relied on the Company for the repair and maintenance of rig component parts. In particular, Defendants represented to Plaintiff that there was a 100% certainty that the Company would receive $800,000 in repair and maintenance work each month in 2014, a total of $9.6 million for the year. Defendants knew or should have known that the Company lacked the ability to maintain a solid base of repair and maintenance services simultaneously with new build fabrication

**COMPLAINT UNDER THE SECURITIES EXCHANGE ACT ETC.-PAGE 4**

197561.2

services and that the prospects for repair and maintenance work were minimal  The Company's actual rig repair and maintenance revenues totaled a mere $500,000 for all of 2014.  Plaintiff viewed the existence of a sizeable repair and maintenance business as critical to its decision to purchase the Securities because it portrayed an integrated supplier relationship with H&P and provided diversification that shielded the Company from a downturn in new rig activity.

18. As part of its due diligence prior to its purchase of the Securities, Plaintiff asked Defendants to furnish a breakdown of revenue and costs associated with new rig work versus repair and maintenance work.  Defendants' responded that a breakdown was not available.  Only after it had purchased the Securities did Plaintiff discover that the breakdown requested was readily available.  Defendants made the misrepresentation to conceal the lack of repair and maintenance work performed by the Company.

19. Plaintiff viewed the Company's expertise, existing customers, existing inventory of orders, and future prospects in the midstream market—serving oil and gas transportation, processing, and storage companies—as the most attractive feature of the Company because the midstream market provided the biggest growth opportunity for the Company and a way to reduce the Company's dependence on H&P.  It also constituted a hedge against downturns in the upstream market.  However, Defendants made material misrepresentations and omissions regarding the Company's midstream business.

20. In response to Plaintiff's written inquiry about the Company's revenue mix, the Defendants trumpeted the Company's expansion into the midstream market, having acquired "new customers," such as Targa Resources ("Targa"), Denbury Resources ("Denbury"), and Arc Energy Equipment LLC ("Arc"), when in fact, Defendants knew that their relationships with all three "new customers" were either non-existent, insignificant, or on thin ice, which rendered Defendants' representations about the status of its midstream business materially false and misleading.

21. At the time that Plaintiff purchased the Securities, the Company represented in a written schedule to the Purchase Agreement that the Company had $936,000 of written purchase orders of midstream jobs from Targa. In fact and in truth, the Company had no purchase orders at all from Targa at the time. The absence of a proven relationship with Targa, a blue-chip company, was material, and had Plaintiff known of it, Plaintiff would not have purchased the Securities.

22. Defendants also provided Plaintiff with a written 2014 forecast projecting $3 million in work from Targa for the year—another $2,064,000 in addition to the (illusory) $936,000 wrongfully classified as work in process. In fact, the year's revenues from Targa were a measly $30,000. Defendants were well aware that the Targa projections were false because the Company did not even have a direct fabrication or field service relationship with Targa at the time of the Securities purchase. The Company's relationship, such as it was, was with a former Targa employee who received improper benefits from the Company and one of its officers, not with Targa directly. At the time of the Securities purchase, the Company had had no revenues at all from Targa. Defendants were aware that their representations about Targa's business prospects and work in process were false and failed to disclose the absence of any real relationship with Targa.

23. At the time of Plaintiff's purchase of the Securities, Defendants knowingly and falsely represented to Plaintiff that the Company would have $540,000 in revenue from Denbury in 2014. The Company did no business with Denbury in 2014. In Defendants' offering circular to potential buyers, Defendants represented that the Company had recently provided $CO_2$ plant and compression station installations at Denbury, although after it purchased the Securities, Plaintiff could find no record of such work. The Company's historical revenues from Denbury are only $600.

24. At the time of the sale, Defendants' represented to Plaintiff that the Company had expertise and experience in costing and managing the midstream line of business. Defendants

**COMPLAINT UNDER THE SECURITIES EXCHANGE ACT ETC.-PAGE 6**

197561.2

represented that the Company had "unmatched certifications and expertise" in American Society of Mechanical engineers (ASME) coded work which provided "expanded resources as well as additional customer satisfaction." However the Company's internal communications, obtained by Plaintiff only after it purchased the Securities, reveal a clear pattern of gross incompetence in both cost estimation and job performance for midstream customers. The Defendants knew, or should have known, that the Company was totally unqualified to pursue most of the coded fabrication services that the Defendants had represented to Plaintiff. Defendants consciously misrepresented and concealed the company's true capabilities and performance in its effort to induce the Plaintiff to purchase the Securities.

25. Defendants represented to Plaintiff prior to the purchase of the Securities that the Company's midstream work was as profitable as its upstream work. Only after the purchase did Plaintiff discover that the Company's coded midstream fabrication business was losing money because of its inability to estimate costs and the lack of expertise to perform the work. As a result, after its purchase of the Securities, Plaintiff had to shut down much of the midstream business to stem the losses.

26. Illustrative of the Company's incompetence in the midstream line of business, is the fact that the Company was sued for $700,000 by Arc over several botched jobs, resulting from the Company's inability to adequately estimate and control costs and to perform quality work. At the time of Plaintiff's purchase of the Securities, Defendants had knowledge that the Company had been threatened with suit by Arc but consciously omitted to disclose it.

27. Since the viability of the Company's midstream line of business was critical to Plaintiff's decision to purchase the Company, had Plaintiff known of the intentional misrepresentation and conscious omissions described above, it would not have purchased the Securities.

28. Due to the well-publicized dramatic decline in the prices of oil and gas that has occurred since Plaintiff purchased the Securities, H&P has informed Plaintiff that it will not be

**COMPLAINT UNDER THE SECURITIES EXCHANGE ACT ETC.-PAGE 7**

197561.2

building any new rigs in the foreseeable future. Without the midstream work that Defendants had represented, the Company's finances have deteriorated dramatically, which has caused the commercial lender to accelerate Bank Loans. Defendants' misrepresentation and omissions regarding the past results and prospects of Company's midstream fabrication business and its repair and maintenance work, which were supposed to provide a cushion against the very decline in the rig-building market conditions that has been experienced, have caused injury to Plaintiff.

29. In the offering circular for the sale of the Securities, Defendants represented that the Company was a valve distributor for ITT, Sea Safe, Kemper Valves and Fittings and Bosch Rexroth, all major value manufacturers. This was false. The Company has no distribution agreements with any valve manufacturers and no distribution territories. At best, the Company acts as a middleman for episodic valve orders from H&P, which it conveys to the manufacturer, marks up the price, and sells to H&P. There is no valve distribution line of business. This was a material misrepresentation that Plaintiff relied on in purchasing the Securitas.

## V. CLAIMS

### Claim I – Violations of Section 10(b) of the Exchange Act and Rule 10b-5

30. Plaintiff incorporates each of the allegations set forth above as if fully set forth herein.

31. Defendants, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter (either knowingly or in reckless disregard of the truth), made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with purchase and sale of the Securities, which are securities within the meaning of the federal securities laws.

32. Each of the misstatements and omissions described above were made intentionally by Defendants to induce Plaintiff to enter into the Purchase Agreement and to

purchase the Securities.  Plaintiffs justifiably relied on Defendants misrepresentations, and had it known that the misrepresentations were false and known of the omissions, it would not have entered into the Purchase Agreement and would not have purchased the Securities.

33. Defendants omissions created a material misimpression, and had Plaintiff known of the material facts omitted, it would not have entered into the Purchase Agreement and would not have purchased the Securities.

34. Defendants' material misrepresentations and omissions go to the heart of the purchase and sale of the Securities and have proximately caused Plaintiff to suffer damage.

*Claim II – Violation of the Mississippi Securities Act of 2010*

35. Plaintiff incorporates each of the allegations set forth above as if fully set forth herein.

36. By making the untrue statements of material fact and omissions of material fact described above, Defendants have violated Miss. Code Ann. § 75-71-501.

37. Defendants are liable to Plaintiff for damages under Miss. Code Ann. § 75-71-509.

*Claim III – Common Law Fraud*

38. Plaintiff incorporates each of the allegations set forth above as if fully set forth herein.

39. The material misrepresentations set forth above were made by Defendants with knowledge of their falsity and with the intent to induce Plaintiff to purchase the Securities.

40. Plaintiff, without knowledge of the truth, reasonably relied on Defendants' misrepresentations to its proximate injury.

## VI. **JURY DEMAND**

41. Plaintiff demands a trial by jury.

## VII. PRAYER

WHEREFORE, Plaintiff Tesco Holdings, LLC requests that Defendants Danny Byrd and DBI Holdings, Inc. be cited to appear herein, and upon trial of this cause, that Plaintiff, be awarded judgment against Defendants jointly and severally for:

(1) Actual damages in the amount shown at trial;

(2) Consequential damages equal to the out-of-pocket transaction costs incurred by Plaintiff in purchasing the Securities as well as the amount of Bank Loans guaranteed by Plaintiff in reliance on Defendants misrepresentations and without knowledge of Defendants' omissions;

(3) Prejudgment and post judgment interest on all amounts payable, under paragraphs (1) and (2) above;

(4) Punitive damages for common law fraud;

(5) All reasonable and necessary attorneys' fees, costs and expenses of litigation; and

(6) Any and all other relief to which Plaintiff may show itself justly entitled.

Respectfully submitted,

_____
Walter H. Boone, MSB #8651
Jennifer J. Skipper, MSB#100808

BALCH & BINGHAM LLP
188 East Capital Street, Suite 1400
Jackson, MS 39201-2608
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
wboone@balch.com
jskipper@balch.com

**ATTORNEYS FOR PLAINTIFF**